

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-26-1995

# Blanche v Bensalem

Precedential or Non-Precedential:

Docket 94-1344

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Blanche v Bensalem" (1995). *1995 Decisions.* Paper 144.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/144

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-1344 & 1362


BLANCHE ROAD CORPORATION, A PENNSYLVANIA
CORPORATION, GENERAL PARTNER AND TRADING AS
BLANCHE ROAD ASSOCIATES, I, A PENNSYLVANIA
LIMITED PARTNERSHIP

v.

BENSALEM TOWNSHIP; DAVID GARY COSTELLO; JOSEPH FRANCANO;
JOHN J. MAHER, JR.; JOSEPH RYAN; PATRICIA A. ZAJAC; JAMES
NOLAN; CHARLES W. SEEBERGER; THOMAS J. WALLS; CARMEN
RADDI; NANDI THAKURIA; HERBERT T. SCHEUREN, JR.,
INDIVIDUALLY AND D/B/A ENVIRONMENTAL ENGINEERING
KINETICS INTERNATIONAL, INC. D/B/A E.E.K.I., INC.
D\B\A DELAWARE VALLEY CONSULTING ENGINNERS, INC.;
LILLIAN E. STEINER; DANIEL D. STAERK; WILLIAM
RICHARD OETTINGER; EMIL F. TOFTEN, ESQUIRE;
JAHN ROOS LANDIS, ESQUIRE

Blanche Road Corporation,
Appellant in 94-1344

Bensalem Township, David Gary Costello (in his official
capacity), Joseph Franco, John J. Maher, Jr. (in his
official capacity), Joseph Ryan (in his official
capacity), Patricia A. Zajac, James Nolan, Charles
Seeberger, Thomas Walls, Carmen Raddi, Lillian E.
Steiner, Daniel D. Staerk, William Richard Oettinger,
Emil F. Toften, Esquire, and Jahn Roos Landis, Esquire

Appellants in 94-1362


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 89-cv-09040)


Argued December 6, 1994

Before: STAPLETON, ROTH and LEWIS, <u>Circuit Judges</u>

(Opinion Filed  May 26, 1995 )

Richard S. Schlegel, Esq.
Peter Hearn, Esq.
Barbara W. Mather, Esq. (Argued)
Edmund B. Spaeth, Jr., Esq.
Pepper, Hamilton & Scheetz
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799

Jan Z. Krasnowiecki, Esq.
Alan K. Cotler, Esq.
Klett, Lieber, Rooney & Schorling, P.C.
2880 One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103

          Attorneys for Appellant/Cross-Appellee

William Goldstein, Esq. (Argued)
I. Leonard Hoffman, Esq.
Groen, Laveson, Goldberg & Rubenstone
Suite 200
Four Greenwood Square
Bensalem, PA 19020

          Attorneys for Appellees/Cross Appellants
          Costello, Maher, Jr. and Ryan

Robert St. Leger Goggin, Esq. (Argued)
L. Rostaing Tharaud, Esq.
William L. Banton, Jr., Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

          Attorneys for Appellees/Cross Appellants
          Township of Bensalem, Francano, Ryan, Nolan,
          Seeberger, Walls, Raddi, Steiner, Staerk, Toften,
          Landis and Zajac

OPINION OF THE COURT

ROTH, Circuit Judge:

This appeal arises from a § 1983 action brought by Blanche Road Associates (Blanche Road) and its general partner, Blanche Road Corporation, against Bensalem Township and several of its officials and employees. The appeal raises several issues, including whether the district court abused its discretion after the first trial by granting a new trial and whether the judge erred by failing to recuse himself in the second trial. We conclude, however, that the dispositive issue is whether, during the second trial, the district court properly granted defendants' motion for judgment as a matter of law. Because we find that the court erred in granting this motion, we will reverse and remand this action for yet another trial.

## I.

Adam and Blanche Talacki purchased a 52-acre tract of undeveloped land in Bensalem Township in 1967. A subdivision and land development plan, dividing the land into 32 lots, was approved by the Township and recorded in 1972. In addition, the Talackis and the Township entered into a one-year subdivision agreement which required the Talackis to complete certain improvements, including roads, curbs, and a drainage system, by June 28, 1973. These improvements were substantially completed.

In 1982, Bensalem Township enacted a subdivision and land development ordinance to assist orderly, efficient and

integrated development of land. This ordinance was amended on June 15, 1987, with the addition of impact fees, based on the number of dwelling units or on the square footage of commercial buildings to be constructed on a developed lot. Township regulation of development and construction was expanded again on July 27, 1987, by enactment of Ordinance 371, which adopted most of the Building Officials & Code Administrators, International, Inc. ("BOCA") National Building Code. Included in this July ordinance was a Code Appeals Board to hear appeals from code violations.

In 1986, the Talackis and Walter and Margaret Czekay decided to develop an industrial park on the 23 undeveloped lots in the subdivision. They formed Blanche Road Corporation, and, with Blanche Road Corporation as the general partner and the Talackis and Czekays as limited partners, they formed Blanche Road Associates, a Pennsylvania limited partnership. Blanche Road Associates began operations by purchasing one lot from the Talackis and entering into an option agreement with them to purchase any or all of the remaining lots over the next four years. The Talackis and Czekays planned to build on the lots sequentially, by investing the proceeds from the sale or lease of one developed lot in the development of the next lot, until the industrial park was completed. To this end, Blanche Road installed water and sewer lines for all of the lots and resurfaced the roads, at a cost of approximately $300,000.

Blanche Road also established a sales office, hired a park manager, purchased construction equipment, and began marketing the lots.

The parties' dispute centers on Blanche Road's attempts to obtain various building permits for lots in the industrial park. Plaintiffs claim that the Township, through its supervisors and employees, engaged in a campaign of harassment designed to force Blanche Road to abandon its development of the industrial park. Defendants, on the other hand, maintain that they were applying the local zoning and permitting regulations in a lawful and reasonable manner.

In Bensalem Township, during the relevant time period, an aspiring developer of a parcel of land was required first to obtain the Township's approval of the subdivision plan and then to acquire three permits. The first permit was a land alteration permit, which gave the developer the right to clear the land of existing vegetation and to alter the course of surface water. In order to qualify for this permit, a developer had to comply with the Township's Land Alteration Ordinance and to show that the work would not cause soil erosion or excessive water flow onto adjoining property. All land alteration permits were approved by the Township Board of Supervisors. Next, in order to erect a building, a developer was required to obtain a building permit by verifying that the building plans were in accord with applicable

building codes.  Finally, after the building was erected but before it could be occupied, a developer had to procure a use and occupancy permit, showing that the building had been constructed in accord with the approved plans and was safe for occupancy. All building permits and use and occupancy permits were approved by the Township Licensing and Inspections Department (L & I).

In 1987, Blanche Road developed, constructed, and sold its first lot, lot 29, without incident.  Blanche Road then obtained permits for, purchased, and began construction on lot 7. The two buildings constructed on the lot were leased to tenants. Blanche Road did not, however, obtain use and occupancy permits for the buildings before they were occupied.  Next, Blanche Road filed applications for a land alteration permit and a building permit for lot 13.  These applications were rejected in June 1987 by the Township zoning officer, building inspector, and fire marshall.  At that time, Fire Marshall John Scott, who had rejected the building permit application, placed a note in Blanche Road's file, that read:  "C.W. -- S.2 -- NO SPRINKLERS -- CAN YOU GET THEM ON SOMETHING ELSE?"[1]  Eventually, Blanche Road's applications for permits for lot 13 were approved, and in August 1987 Blanche Road completed its purchase of lot 13 and began construction.

_____

1According to plaintiffs, "C.W." stands for Cynthia Williams, the Township building inspector at the time; "S.2" was a building code classification for "low hazard" storage materials; and "No sprinklers" refers to the fact that, given the size of the building planned for lot 13, sprinklers were not required.

In October 1987, Blanche Road filed applications for land alteration and building permits for lots 14 and 26. In November the permits for lots 14 and 26 were withheld, pending payment of "impact fees" of approximately $9,600 for lot 14 and $16,000 for lot 26. The impact fees, imposed pursuant to the June 15, 1987, amendment to the Township's Subdivision and Land Development Ordinance, assessed commercial developers a fee of $.80 per square foot of proposed floor area.[2] Blanche Road protested the imposition of the impact fees, arguing that the ordinance was not applicable because the Township had approved the industrial park's subdivision and development plan prior to the ordinance's enactment. In response to Blanche Road's protest, Richard Moore, the Township's solicitor, "waived" the impact fees. Permits for lots 14 and 26 were then issued, and Blanche Road began construction on them.

In a December 1987 meeting, however, Township officials, including the director of L & I, Staerk, the Township engineer, Scheuren, and zoning officer, Steiner, told Walter Czekay that, despite Moore's determination to the contrary, Blanche Road would be required to pay impact fees on lots 14 and 26. They also informed Czekay that impact fees were owed on lot 13 and that Blanche Road would be required to establish an escrow account of $10,000 per lot to cover engineering fees. According

---

[2]Under the ordinance, impact fees were to be paid to L & I upon the issuance of a building permit.

to Czekay's trial testimony, Staerk told Czekay that, if Blanche Road failed to pay the impact fees, Staerk would take whatever action was necessary to stop construction at the industrial park.

Blanche Road refused to pay the impact fees or to establish an escrow account for the engineering fees. Later that month, on December 22, Code Enforcement Officer William Oettinger issued a stop work order on construction at the Blanche Road site. As of that date, Blanche Road was constructing on lots 13, 14, and 26. Oettinger issued the citations to Blanche Road, based upon violation of erosion and sedimentation control measures outlined in the land alteration permits. In part, these citations charged violations on lots which were still owned by the Talackis. A citation was also issued for land alteration without a permit. In issuing the stop work order, Oettinger threatened that, if work did not stop at once, he would send police to arrest all Blanche Road representatives and workmen on the site. He then wished plaintiffs' representatives a "Merry Christmas."

Plaintiffs contend that there was no basis for the stop work order because it was the Township's usual practice to give a developer ten days to correct a deficiency before issuing such an order. Moreover, plaintiffs argue that the Township's building code authorized the issuance of stop work orders only with respect to "work on any building or structure . . . being prosecuted . . . contrary to the . . . code or in an unsafe or

dangerous manner," and that no such violations were noted on the stop work citations. Finally, plaintiffs point out that the Township's Building Inspector, Cindy Williams, had been at the site approximately three days prior to the issuance of the stop work order and had not issued any citations.

Blanche Road attempted to appeal the citations and the stop work order to the Township's Zoning Hearing Board. The Township instead directed the appeal to the Code Appeals Board, created in July 1987. Because the Code Appeals Board had not in fact been formed, the Township's Board of Supervisors quickly assembled a Board to hear Blanche Road's case. On January 11, 1988, a hearing was convened with three members of the newly constituted Code Appeals Board, but the Board declined to reach the merits of Blanche Road's appeal. At a second hearing, on February 2, 1988, Blanche Road was informed that the Board would not entertain the appeal because the Board did not have jurisdiction over the matter.[3]

One month later, Scheuren returned to the Blanche Road site with an enforcement officer from the Bucks County Conservation District, the agency responsible for enforcement of Pennsylvania's Clean Streams Act. The Conservation District officer cited Blanche Road for failing to file or to comply with

---

[3]Two reasons were given for the lack of jurisdiction: the stop work order was based on ordinance violations rather than on violations of the BOCA code, and the Board members were uncertain about their qualifications to serve on the Board.

a sedimentation and erosion plan.  The Township solicitor recommended that Blanche Road's permits be revoked until such time as compliance with state and local law was established.  On February 8, 1988, Oettinger served Blanche Road with a notice of revocation of building and land alteration permits for lots 13, 14, and 26, as well as with a second stop work order.[4]

On February 28, 1988, Blanche Road filed a state court equity action seeking to enjoin revocation of its permits.  Pursuant to a stipulation agreed to by the parties and approved by the court, the permit revocations were rescinded.  In June and July 1988, Blanche Road applied for use and occupancy permits for lots 13, 14, and 26; as earlier had been the case with the permit for lot 7, the application was altered to require an additional inspection and approval by engineer Scheuren.

When Blanche Road filed applications for land alteration permits for lots 12, 21, 11, 15, and 8, the Township treated them as subdivision and land development permit applications.  This treatment is significant because subdivision and land development applications require a more extensive review and are more time-consuming and costly than applications for land

---

[4]The permit revocation notice and second stop work order cited additional violations, including failure to comply with certain regulations promulgated under the Pennsylvania Clean Streams Act and failure to obtain a Use and Occupancy permit for lot 7, which was occupied.

Oettinger also filed a criminal complaint against Czekay personally for occupying a building on lot 7 without a use and occupancy permit; the complaint, however, was filed in the wrong district and was ultimately withdrawn.

alteration permits.  Building permits for lots 12, 21, 15, and 8 were eventually issued as "conditional" permits, containing a notation that the Township was not surrendering its right to collect impact fees on the lots.[5]

Finally, and perhaps most significantly, Blanche Road cites the testimony of Township Engineer Scheuren as evidence that the Township and its officials conspired to delay and ultimately to shut down Blanche Road's development of the industrial park.  Scheuren testified that all three Supervisor defendants (Ryan, Costello, and Maher) told him to review Blanche Road's permit applications with extra scrutiny in order to "slow down" the development.  According to Scheuren, Maher told him to prepare a "punch list" for lot 7 by looking for every possible violation and to proceed with whatever soil erosion violations he could find at the site in order to continue the stop work orders.

Plaintiffs allege that, due to the Township's insistence on the payment of inapplicable impact fees and to the Township's improper refusal to release and issue permits, the Talackis and the Czekays decided not to finish the project. Blanche Road was closed down.

## II.

---

[5]Blanche Road contends that, because no one had ever encountered "conditional" permits before, the permits created problems with Blanche Road's bank and caused a potential buyer of lot 21 to back out of its deal.

On December 20, 1989, plaintiffs brought the instant action under 42 U.S.C. § 1983, alleging violations of their equal protection and due process rights in connection with the development of selected lots in the industrial park.[6] In addition to the Township, several officials and employees of the Township were named as defendants, including: the five Supervisors in office at the time the suit was filed (Costello, Francano, Maher, Ryan, and Zajac), the members of the Township Code Appeals Board (Nolan, Seeberger, and Walls), Township Manager Raddi, Zoning Officer Steiner, Director of the Department of Licenses and Inspections (L & I) Staerk, Code Enforcement Officer Oettinger, Township Engineers Scheuren and Thakuria, and Solicitor Toften and his associate Landis.

Blanche Road sought four types of damages from these defendants: (1) damages resulting from the Township's delay in issuing permits for lots 7, 8, 10, 12, 13, 14, 15, 25, and 26; (2) overhead costs and legal fees; (3) lost opportunity costs on lots 11 and 21, which Blanche Road unsuccessfully attempted to develop; and (4) lost profits which would have been earned from the remaining lots in the subdivision if Blanche Road had had the opportunity to purchase or develop them.

---

[6]Blanche Road's equal protection and procedural due process claims were dismissed during the first trial, and Blanche Road has not pursued those claims. Accordingly, the only claim presented to the jury at the first trial and raised in the second trial is a violation of substantive due process.

During the first trial, the district court held as a matter of law that Blanche Road could not recover damages in connection with the lots which it never purchased and for which it had never applied for permits. The court based this ruling on its conclusion that, in addition to being speculative, any damages arising from the non-optioned lots could not causally be linked to defendants since defendants had never had the opportunity to act on any permits in connection with the lots. In accordance with the court's ruling, Blanche Road was precluded from submitting evidence of any damages suffered in connection with the non-optioned lots.

At the close of plaintiffs' case in the first trial, the district court granted judgment as a matter of law in favor of defendants Staerk, Toften, Francano, Zajac, and Raddi, on the basis of insufficient evidence.[7] Therefore, due to the earlier dismissal of several other defendants from the case,[8] Blanche Road's substantive due process claims proceeded to trial against the following defendants: the Township; Supervisors Costello, Ryan, and Maher; Township Engineers Scheuren and Thakuria; and Code Enforcement Officer Oettinger.

---

[7]Blanche Road appeals this ruling only insofar as it applies to Staerk.

[8]Defendants Steiner and Landis were previously dismissed by stipulation. In addition, the claims against defendants Walls, Seeberger, and Nolan (members of the Code Appeals Board) were dismissed on summary judgment. Blanche Road does not appeal as to any of these defendants.

At the end of the first trial, the jury returned a verdict for plaintiffs, with special interrogatories finding that (1) Blanche Road's substantive due process rights had been violated, (2) the remaining defendants were responsible for this violation, and (3) defendants Costello, Ryan, and Maher had participated in a conspiracy to violate Blanche Road's rights. The jury also found that Blanche Road was entitled to total compensatory damages of $2 million, of which defendants Costello, Ryan, and Maher were liable for $500,000 each, and defendants Scheuren, Thakuria, and Oettinger were liable for $165,000 each.[9] At the time of the verdict, the district court noted that the sum of the individual compensatory damages award fell short of the total compensatory damages award of $2 million and also that the jury had not specified the amount of damages for which the Township was liable. The court offered to ask the jury an additional question regarding the Township's liability, but counsel for both sides agreed that the court should simply make an appropriate finding based upon the verdict. The district court then awarded damages against the Township in the amount of $1,500,000, representing the compensatory damages awards against the three Supervisor defendants. The court explained that it did not hold the Township liable for the damages assessed against

---

[9]The jury also found that the individual defendants were liable for punitive damages in the following amounts: Costello, Ryan, and Maher were liable for $2.00 each; Scheuren, Thakuria, and Oettinger were liable for $1.00 each.

Oettinger, Scheuren, and Thakuria because the jury had found that those defendants did not conspire with the Supervisors to violate Blanche Road's rights.

Following the trial and the verdict, the Township, the Supervisor defendants, and Oettinger all moved for judgment as a matter of law under Rule 50, Fed. R. Civ. P., or for a new trial.[10] The district court denied the Township and the Supervisor defendants' motions, holding that there was sufficient evidence to support the jury verdicts against them. The court granted these defendants' motion for a new trial, however, on the basis that plaintiffs' counsel had "pursued a pattern of misconduct from opening statement through final argument" that led to the introduction of inadmissible and prejudicial information before the jury. The court found that there was a "reasonable probability that the jury's findings were influenced by Plaintiffs' counsel's highly improper conduct, to the unfair prejudice of the moving Defendants." Blanche Road Corp. v. Bensalem Township, No. 89-9040, mem. order at 2 (Aug. 26, 1993). The district court also granted Oettinger's motion for judgment as a matter of law, finding that the evidence did not show that he had acted with an improper motive or bad faith. Id. In the event that judgment for Oettinger was reversed on appeal, the district court granted him a new trial for the same reason it had

---

[10]Defendants Scheuren and Thakuria have not challenged the judgments against them and are not part of the instant appeal.

granted a new trial for the Township and the Supervisor defendants. Id.

During the second trial, plaintiffs moved for recusal of the district court judge, who had presided over the case from the beginning. Blanche Road's motion was based upon the district judge's manner in questioning some of plaintiffs' witnesses. The judge denied the motion, and the trial continued.

At the close of plaintiffs' case in the second trial, the district court granted the remaining defendants' motions for judgment as a matter of law under Rule 50(a), Fed. R. Civ. P., and dismissed the case by final order entered on March 2, 1994.

III.

The district court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, as the instant appeal and cross-appeal follow from a final judgment entered by the United States District Court for the Eastern District of Pennsylvania.

IV.

In this appeal, plaintiffs challenge several decisions made by the district court over the course of both trials.[11] Specifically, in connection with the first trial, plaintiffs

---

[11]Defendants also raise issues pertaining to both trials on cross-appeal. To the extent that these issues are not dealt with by our remand of this case for a new trial, we resolve them in Section VI.B., supra.

challenge: (1) the district court's grant of defendants Staerk and Oettinger's Rule 50 motions, (2) the district court's grant of a new trial, (3) the district court's decision barring plaintiffs from presenting damages evidence pertaining to the subdivision lots that plaintiffs never attempted to purchase, and (4) the district court's molding of the verdict in response to the jury's answers to special interrogatories. Plaintiffs also challenge the district court's decisions in the second trial to deny plaintiffs' motion for recusal and to dismiss plaintiffs' claims against the remaining defendants.

V.

A.

Turning our attention to the issues arising from the first trial, we find that the district court did not err in granting the Rule 50 motions on behalf of Staerk and Oettinger. A Rule 50(a) directed verdict may be granted if, construing all the evidence presented in the light most favorable to the party opposing the motion, the court finds as a matter of law that no jury could decide in favor of the nonmoving party. In reviewing the district court's grant of the Rule 50 motions, we exercise plenary review. See Indian Coffee Corporation v. Proctor & Gamble, Co., 752 F.2d 891, 894 (3d Cir. 1985).

At the close of plaintiffs' case, the only evidence which had involved Staerk was testimony that Staerk directed Walter Czekay to pay the impact fees and that he threatened to

shut down the development if the fees were not paid. This evidence was insufficient to support a finding that Staerk violated plaintiffs' civil rights. In order to demonstrate that Staerk, as a government agent, violated plaintiffs' civil rights, plaintiffs would have had to show either that (1) Staerk's actions were not rationally related to a legitimate government interest; or (2) that Staerk's actions were "in fact motivated by bias, bad faith or improper motive." Parkway Garage v. Philadelphia, 5 F.3d 685, 692 (3d Cir. 1993) (citing Midnight Sessions, Ltd. v. Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991), cert. denied, 112 S.Ct. 1668 (1992)). Clearly, Staerk's demand that plaintiffs pay impact fees required by a county ordinance is rationally related to a legitimate government interest. Plaintiffs, therefore, were required to demonstrate that Staerk's actions were motivated by bias, bad faith or improper motive. Had plaintiffs presented additional evidence indicating that Staerk attempted to collect the impact fees for an improper reason, their civil rights claim against Staerk could have survived a motion for judgment as a matter of law. Because plaintiffs failed to present any such evidence, however, the district court did not err in granting judgment in favor of defendants on plaintiffs' claims against Staerk.

Plaintiffs' argument that Staerk should be liable under a theory of supervisor liability also fails. It is well settled that the doctrine of respondeat superior may not be employed to

impose § 1983 liability on a supervisor for the conduct of a subordinate which violates a citizen's constitutional rights. Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978). Instead, in order to establish Staerk's liability for the actions of Oettinger, his subordinate, plaintiffs were required to produce evidence first that Oettinger's conduct violated plaintiffs' constitutional rights and second that Staerk knew of Oettinger's conduct and approved it. See St. Louis v. Praprotnik, 485 U.S. 112 (1988); Kernats v. O'Sullivan, 35 F.3d 1171, 1182 (7th Cir. 1994). Because plaintiffs satisfied neither requirement, the district court properly granted Staerk's Rule 50 motion.

Furthermore, we conclude that the district court properly granted judgment as a matter of law on plaintiffs' claims against Oettinger. This ruling followed the jury's verdict, which found that Oettinger was not involved in the conspiracy to violate plaintiffs' constitutional rights. The district court reasoned that, without the actions of the co-conspirators being charged to him, insufficient evidence existed to establish bad faith or improper motive on the part of Oettinger. Citing Winn v. Lynn, 941 F.2d 236 (3d Cir. 1991), the district court held that Oettinger fell into the category of government officials performing discretionary functions whose conduct "does not violate clearly established statutory or

constitutional rights which a reasonable person would have known." Id. at 239.

Plaintiffs take issue with this conclusion, arguing that Oettinger did manifest bad faith by wishing Czekay and others a "Merry Christmas," after issuing the first stop work order, and by filing a criminal complaint against Czekay for occupying a building on lot 7 without an occupancy permit.[12] Neither of these actions, however, unpleasant as they may be, rise to the level of bad faith required to support a § 1983 violation. Nor, in view of the jury finding that Oettinger was not a part of the conspiracy, can these actions be considered to have been taken by Oettinger as a part of the overall conspiracy. Moreover, it is undisputed that erosion and sedimentation control violations did exist in the industrial park area when the stop work orders were issued. Plaintiffs in essence failed to prove that Oettinger had the motivation or bad faith required if there is to be a finding that he committed a substantive due process violation. See Parkway Garage, 5 F.3d at 692. Accordingly, the case against Oettinger was properly dismissed by the district court.

B.

---

[12]Czekay was not in fact an occupant of the lot 7 building. The building was, however, being occupied without a permit. As we note infra in footnote 4, this complaint against Czekay was ultimately withdrawn.

The next question arising from the first trial is whether the district court properly granted defendants' motion for a new trial. As noted in Olefins Trading v. Han Yang Chem Corp., 9 F.3d 282, 290 (3d Cir. 1993), this Court applies a deferential "abuse of discretion" standard when reviewing a trial court's grant of a new trial motion. Specifically, in cases involving counsel misconduct, we defer to the trial court's assessment of the level of prejudice involved "because the trial judge was present and able to judge the impact of counsel's remarks." Fineman v. Armstrong World Indus., 980 F.2d 171, 207 (3d Cir. 1992).

In its Memorandum Order of August 24, 1993, the district court, after expressly stating that the jury's verdict was supported by the weight of the evidence when viewed in the light most favorable to plaintiffs, granted defendants' motion for a new trial on the ground of counsel misconduct. The Court reasoned:

> [T]he record reveals that counsel for Plaintiffs pursued a pattern of misconduct from opening statement through final argument. Unfortunately, Plaintiffs' counsel was able to get before the jury information that was inadmissible as evidence and clearly unfairly prejudicial to moving defendants. Counsel's pattern of conduct is probative of his belief that such misconduct was necessary to the success of Plaintiffs' case. I am convinced beyond any doubt that there is a reasonable probability that the jury's findings were influenced by Plaintiffs' counsel's highly improper conduct, to the unfair prejudice of the moving Defendants. Moreover, cautionary instructions could not and did not cure the unfair prejudice. I must grant a new trial not as

> punishment to Plaintiffs' counsel, but to assure fairness and due process to moving defendants.

Blanche Road Corp. v. Bensalem Township, No. 89-9040, slip op. at 2 (E.D.Pa. Aug. 24, 1993) (footnote omitted). Thus, the district court's decision to grant defendants a new trial was based upon the court's determination that plaintiffs' counsel had engaged in misconduct that had in all probability influenced the jury.

In this circuit, the test for determining whether to grant a new trial in cases involving counsel misconduct is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir. 1994) (citing Fineman v. Armstrong World Indus., 980 F.2d 171, 207 (3d Cir. 1992)). In the instant case, it is clear that the district court did not abuse its discretion by finding that this standard was met; the record is replete with examples of counsel misconduct that might have influenced the jury. For example, counsel repeatedly argued with the court regarding its rulings, see, e.g., Joint Appendix (J.A.) 212, 251, 868, even going so far as to inform the court, in the presence of the jury, that it was not treating counsel or his client fairly. J.A. 373, 869. Counsel also commented before the jury, based on the cross-examination of his witness, Walter Czekay, that Czekay had "answered honestly, candidly, accurately. His testimony is excellent." J.A. 1083. In addition, counsel in his closing argument referred to backdated documents, for which no evidence

existed in the record; he argued that Costello, Ryan, and Maher had told Scheuren "to backdate some documents and then they watch him go to jail." J.A. 3051. This short list is representative of the type of counsel misconduct that permeated the first trial. The district court's decision to grant a new trial on this basis was not an abuse of discretion.

C.

The next issue raised in connection with the first trial is the district court's decision to mold the verdict to conform with the jury's responses to special interrogatories. This issue is rendered moot, however, in light of our decision to affirm the district court's grant of the second trial.

D.

Finally, plaintiffs contend that the district court erred in holding as a matter of law during the first trial that Blanche Road could not recover damages in connection with the lots that it had never purchased and for which it had never applied for permits. The court based its ruling on its conclusion that, in addition to being speculative, any damages arising from the non-optioned lots could not be causally linked to defendants since defendants never had the opportunity to act on any permits in connection with the lots. (J.A. 812-14).

Section 1983 "creates 'a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution.'" Memphis

Community School Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (quoting from Carey v. Piphus, 435 U.S. 247, 253 (1978) (internal quotation and citation omitted)). Damages in § 1983 "cases are designed to provide 'compensation for the injury caused plaintiff by defendant's breach of duty.'" Id. at 306 (quoting from 2 F. Harper, F. James, & O. Gray, Law of Torts § 25.1 (2d ed. 1986)). "To that end, compensatory damages may include [both] out-of-pocket loss and other monetary harms," as well as more intangible injuries, resulting from the breach. Id. at 307.

"The level of damages [in a § 1983 case] is ordinarily determined according to principles derived from the common law of torts." Id. at 306 (emphasis supplied). That common law is reflected in the law of Pennsylvania. Under Pennsylvania law, speculative damages may not be awarded. Damages are considered speculative if "the uncertainty concerns the fact of damages, not the amount." See Carroll v. Philadelphia Housing Auth., 650 A.2d 1097 (Pa. Cmwlth. 1994). Consequently, damages are not considered speculative merely because they are not capable of exact calculation. See Ashcraft v. C.G. Hussey & Co., 359 Pa. 129, 58 A.2d 170 (1948). Rather, Pennsylvania law merely requires that plaintiffs present a reasonable quantity of information from which a jury can fairly estimate the damages. Id.

In the instant case, plaintiffs met this burden. Plaintiffs established that, as of 1986, plaintiffs had an option

to purchase and develop 23 lots in the Blanche Road subdivision. In reliance on this option, plaintiffs invested $300,000 in road improvements and water and sewer lines which benefited the whole industrial park. Furthermore, plaintiffs showed that, two years later, they abandoned their attempt to develop the industrial park. They contend that the premature termination of the project was caused by defendants' deliberate interference and delay.

The district court dismissed the claim on ripeness grounds: the options to purchase had not been exercised and no permits had been sought for these lots. As we will discuss more fully below in Section VI.B., under plaintiffs' theory that defendants' deliberate delay caused their loss, plaintiffs need not wait for the exercise of the options or the completion of the permitting process before bringing suit. We conclude that the district court erred in precluding plaintiffs from pursuing their claim for recovery of damages resulting from their alleged inability to develop lots that they never purchased. Nevertheless, plaintiffs will still bear the burden of proving causation and of offering sufficient evidence of loss to demonstrate that these damages can reasonably be calculated and consequently are not unduly speculative.

VI.

Two issues arise on the appeal from the second trial. First, plaintiffs challenge the district judge's decision not to recuse himself from the second trial. Second, plaintiffs

challenge the district court's granting of judgment as a matter of law on all claims against the remaining defendants.

### A.

In reviewing a judge's decision not to recuse himself, our standard of review is abuse of discretion. See Edelstein v. Wilentz, 812 F.2d 128, 131 (3d Cir. 1987).

Plaintiffs' argument for recusal in this case focuses on the district judge's comments, both before the jury and at sidebar, indicating his distrust toward and frustration with plaintiffs and plaintiffs' counsel. These comments include the court's suggestion that plaintiffs' counsel had somehow "maneuvered" to ensure Scheuren's appearance as a witness, J.A. 4217, and the court's declaration that plaintiffs' counsel conducted the worst direct examination the court had ever seen. J.A. 273. The district judge was also skeptical of plaintiffs' witnesses, as reflected in his extensive questioning of them and his comment during argument on the motion to recuse that Czekay "doesn't have any right to say things which are not true initially and hope that it doesn't get clarified either by cross-examination or the Court." J.A. 4455.

Under 28 U.S.C. § 455(a), recusal is required whenever a judge's impartiality "might reasonably be questioned." Accordingly, a judge should recuse himself where "a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality." United States v. Dalfonso, 707 F.2d

757, 760 (3d Cir. 1983); see also Alexander v. Primerica Holdings, 10 F.3d 155 (3d Cir. 1993) (ordering the reassignment of a case because the judge's impartiality could reasonably be questioned).

We recently interpreted the standard of "impartiality" required under 28 U.S.C. § 455(a) in United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994). Citing Liteky v. United States, 114 S. Ct. 1147 (1994), we stated that the "extrajudicial source" doctrine arising under 28 U.S.C. § 455(b)(1)[13] also applies to § 455(a). Under the "extrajudicial source" doctrine, "bias, in order to form the basis for recusal, must stem from a source outside of the official proceedings." Bertoli, 40 F.3d at 1412. Consequently, because the source of the bias must be an external source, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id. (citing Liteky, 114 S. Ct. at 1157).

Despite this external source requirement, recusal may still be required if the judge's actions during the trial, considered objectively, "display a deep-seated favoritism or antagonism that would make fair judgment impossible." Bertoli, 40 F.3d at 1412; see also United States v. Antar, Nos. 94-5228 and 94-5230, slip op. at 7-20 (3d Cir. Apr. 12, 1995) (requiring

---

[13]Section 28 U.S.C. § 455(b)(1) requires disqualification when the judge "has a personal bias or prejudice concerning a party."

recusal after the judge explicitly revealed having an improper goal in the proceeding).  After reviewing the record in this case, however, we do not find that the district judge's actions demonstrated the type of bias warranting his recusal from the case.  Although it is true that at times the judge criticized plaintiffs for attempting to mislead the jury and became short-tempered with plaintiffs' counsel, these comments appear to arise from the judge's impatience and frustration with the manner in which plaintiffs were trying their case, rather than any partiality for defendants.  As Justice Scalia wrote in Liteky:

> Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune.

114 S. Ct. at 1157.  Accordingly, because the district judge's actions and comments did not manifest a deep-seated bias that would render fair judgment impossible, we find that he did not abuse his discretion in not recusing himself from the second trial.

B.

The second issue from the second trial is the district court's granting of judgment as a matter of law to defendants after the completion of the plaintiffs' case.  A Rule 50(a) directed verdict may be granted only if, as a matter of law,

viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor.  Our review of the grant of such a motion is plenary.  See Indian Coffee Corp. v. Proctor & Gamble Co., 752 F.2d 891, 894 (3d Cir. 1985).

In granting defendants' Rule 50(a) motion, the district court made the following conclusions of law:

> [T]here are certain things which are absolutely undisputed on record.  That is, that Blanche Road did, in fact, apply for a number of permits . . . . Except for one, . . . Blanche Road had approval of the permits and proceeded to build pursuant to the permits on all except lots 21 and 11.
>
> . . . .
>
> As was noted by Judge Scirica in Acierno, the property owner has a high burden of proving that a final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds.  No such showing of such final decision has been made in regard to those lots . . . on which Blanche Road did not exercise its option to become owner, upon which Blanche Road never applied for a permit; and therefore, obviously there's no ripeness as to those.
>
> . . . .
>
> As to the lots for which Blanche Road applied for permits, they would fall within a separate category. As to those, I read the cases, including Acierno, as limiting substantive due process violations to mature constitutional claims, which conclusively bar the use of the property.
>
> There is no such conclusive bar here as to any of the properties.  And, in fact, they had been utilized

with the exception of lots 21 and 11, which apparently have not as yet been constructed.

. . . .

As to lot 11, plaintiff has offered into evidence . . . a notice of rejection of application for permit.

. . . While there is this evidence of a rejection, the record is devoid of any attempt . . . to appeal that to the zoning board for final determination.

I read the zoning regulations as giving jurisdiction to the zoning hearing board in such cases, and, therefore, I find . . . that the controversy over lot 11 has not developed into a mature constitutional claim, and must dismiss it because of ripeness.

(J.A. 5217-5222).

Thus, in granting defendants' Rule 50(a) motion, the court applied the standards applicable in zoning cases, such as Acierno v. Mitchell, 6 F.3d 970 (3d Cir. 1993), to the instant case. For the reasons that follow, however, the ripeness requirement arising in zoning dispute cases does not apply to Blanche Road's claims and, consequently, defendants' Rule 50(a) motion should not have been granted.

In Acierno, the plaintiff challenged the county's denial of his application for a building permit. We held that the plaintiff's claim was unripe because, although his application had been rejected by the county's Development and Licensing Division, he had failed to appeal the decision to the county's Board of Adjustment, which had final authority to interpret the zoning regulations. Accordingly, plaintiff did not have a "final decision" from the county until the Board of

Adjustment rendered its decision on his permit application.  See also Midnight Sessions, Ltd. v. Philadelphia, 945 F.2d 667, 686 (3d Cir. 1991) ("This failure to appeal precludes 'final administrative action' by the City and, therefore, these claims were premature . . . .").

In the instant case, however, plaintiffs' claims are not dependent on a final decision from the county, since plaintiffs are not appealing from an adverse decision on a permit application.[14]  Rather, plaintiffs are asserting that defendants, acting in their capacity as officers of the Township, deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiffs' permits, and that defendants did so for reasons unrelated to the merits of the application for the permits.  Such actions, if proven, are sufficient to establish a substantive due process violation, actionable under § 1983, even if the ultimate outcome of plaintiffs' permit applications was favorable.[15]  See Bello v. Walker, 840 F.2d 1124, 1128-30 (3d Cir. 1988) (factfinder could conclude that council members, acting in their official capacity, improperly interfered with

_____

[14]In fact, virtually all of plaintiffs' permit applications were ultimately approved.

[15]For this reason, we reject defendants' argument that Blanche Road failed to assert a constitutional claim because it had no vested property right that could be subject to a due process violation.  Plaintiffs had the right to be free from harassment in their land development efforts.

building permit process for partisan political or personal reasons unrelated to the merits of the permit applications). This is a substantively different type of claim than that presented in the ripeness cases, and internal review of the individual permit decisions is thus unnecessary to render such a claim ripe.

The district court also erred in ruling that plaintiffs' use of their property had to be "conclusively barred" in order for plaintiffs to state a claim. We have previously held that, in order to prevail on a takings claim, a plaintiff must establish that its intended use of its property was "conclusively barred" by the disputed land use regulation. See Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1029 (3d Cir.), cert. denied, 482 U.S. 906 (1987). In the instant case, however, plaintiffs are not claiming that their property was unconstitutionally taken for a governmental purpose without just compensation. Rather, plaintiffs claim that defendants acted deliberately and under color of state law to deprive them of their property rights by interfering in and delaying the issuance of permits. Accordingly, the district court, by relying on the ripeness standard set forth in Acierno and the "conclusively barred" standard set forth in Pace Resources, applied the wrong legal standard in granting defendants' Rule 50(a) motion.

The question remains, however, whether defendants' Rule 50(a) motion should be granted if the proper legal standard were applied. Defendants posit two arguments to support their contention that, viewing all the evidence in the light most favorable to plaintiffs, no jury could find in plaintiffs' favor. First, defendants argue that, under Pennsylvania's "deemed approval" statute, 53 Pa. C.S.A. § 4104, plaintiffs cannot establish damages arising from any delays in the issuance of their permits. Under the statute, if a municipality does not approve or reject a permit application within 90 days, the application is deemed approved. Plaintiffs either were granted permits within the 90 day period or they did not take legal steps to force the issuance of the permit after the expiration of the 90 days. The "deemed approved" statute, however, does not foreclose damages based upon intentional delays in the issuance of permits. One need only consider a hypothetical situation in which officials, seeking to sabotage a developer's project, intentionally withheld each permit for 89 days or for an even longer period until the applicant would take legal steps. Such deliberate and arbitrary delays could cause significant additional expense to the developer.

Next, the Supervisor defendants contend that their Rule 50(a) motion should be upheld on the alternative ground that they were entitled to qualified immunity. Comparing the instant case to Acierno v. Cloutier, 40 F.3d 597 (3d Cir. 1994) ("Acierno

II"), the supervisor defendants assert that, because Pennsylvania law is unclear as to whether a landowner's subdivision approval renders him immune from subsequent zoning amendments, the Supervisors should be entitled to immunity for their decision to treat plaintiffs' land alteration permit applications as land development permit applications and for their decision to assess the impact tax on the property. Furthermore, the Supervisor defendants assert that they are entitled to qualified immunity for any personal involvement they might have had in the stop work orders and permit revocations issued for lots 13, 14 and 26, because there was a perceived threat to public health, safety, and welfare.

The test for determining whether government officials are entitled to qualified immunity for their actions, as set forth in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Id</u>. at 818. In the instant case, however, when the evidence is viewed in the light most favorable to plaintiffs, it is clear that defendants could not have reasonably believed that their conduct did <u>not</u> violate defendants' rights. If defendants, for reasons unrelated to an appropriate governmental purpose, intentionally conspired to impede the development of the Blanche

Road project, by ordering that Blanche Road's applications be reviewed with greater scrutiny in order to slow down the development and by ordering that efforts be taken to shut down the development, such an arbitrary abuse of governmental power would clearly exceed the scope of qualified immunity. Accordingly, the defense of qualified immunity is not available to defendants in the instant matter.[16]

## VII.

For the above stated reasons, we will vacate the district court's order, granting defendants' Rule 50(a) motion, and we will order a new trial in this matter. On retrial, the plaintiffs may present evidence of loss suffered from their inability to develop the lots, which they did not purchase and

---

[16]The Township has cross-appealed on the ground that there was insufficient evidence from which a jury could find a Township policy based upon a custom of tolerating or sanctioning conduct that violated plaintiffs' rights. Our review, however, convinces us that the plaintiffs' evidence was sufficient for a jury to conclude that Township Supervisors Costello, Ryan, and Maher all conspired to shut down the Blanche Road development.

Under § 1983, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). In determining whether an official holds such policymaking authority, courts are to consider whether an official has "final, unreviewable discretion to make a decision or take an action." Andrews, 895 F.2d at 1481. In the instant case, the Supervisor defendants had clear authority to execute final, nonreviewable actions, as evidenced by their control over the licensing process in the Township. Accordingly, plaintiffs' evidence, if believed, is sufficient to establish Township liability under § 1983.

for which no permits were sought, if they can establish a causal link between such loss and the defendants' actions and if they can present a basis, which is not unduly speculative, for calculating such loss.